Filed 10/10/23  P. v. Rockwell CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALLAN THOMAS ROCKWELL,<br><br>Defendant and Appellant. | F084177<br><br>(Super. Ct. No. CRF65302)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Allan Thomas Rockwell was convicted on several counts of elder theft and identity theft for stealing from his uncle.  Defendant contends:  (1) his convictions for elder theft and identity theft are not supported by substantial evidence; (2) the

prosecution committed error under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to disclose exculpatory evidence to the defense; (3) the prosecutor engaged in misconduct by misleading the jury and failing to notify defendant of exculpatory information; (4) alternatively, defendant argues defense counsel rendered ineffective assistance of counsel for failure to request or review the prosecution's evidence; and (5) the restitution awarded to the victim amounts to a windfall because the amount includes money already reimbursed to the victim.

The People respond that: (1) there is substantial evidence to support defendant's convictions for elder theft and identity theft; (2) there was no *Brady* error since the purportedly exculpatory evidence was readily available to defendant; (3) there was no prosecutorial error because there is no evidence defendant received an unfair trial and the prosecutor did not use deceptive or reprehensible methods to persuade the jury; (4) defense counsel did not provide ineffective assistance of counsel; and (5) the restitution order should be modified to correct a calculation error but otherwise affirmed.

We will order the trial court to amend the restitution order and the abstract of judgment to reflect the correct amount owed to the victim. We otherwise affirm the judgment.

## PROCEDURAL SUMMARY

On January 6, 2022, the District Attorney of Tuolumne County filed a first amended information charging defendant with 11 counts of felony grand theft from an elder (Pen. Code,[1] § 368, subd. (d); counts I-VI, VIII, XV, XVII, XVIII, XX); nine counts of identity theft (§ 530.5, subd. (a); counts IX-XIV, XVI, XIX, XXI); and one count of misdemeanor grand theft from an elder (§ 368, subd. (d); count VII). The information further alleged four aggravating circumstances on all counts: the victim was

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2.

particularly vulnerable (Cal. Rules of Court,[2] rule 4.421(a)(3)); the manner of crime indicates planning, sophistication or professionalism (rule 4.421(a)(8)); the crime involved an attempted or actual taking or damage of great monetary value (rule 4.421(a)(9)); and defendant took advantage of a position of trust to commit the offenses (rule 4.421(a)(11)).[3]

On February 1, 2022, the jury found defendant guilty on counts II through IV and VI through XX but not guilty on counts I and V.[4] The jury found true the aggravating circumstance that defendant took advantage of a position of trust to commit the crimes on all counts for which he was guilty but hung on the other three aggravating circumstances.

On March 25, 2022, the trial court dismissed counts II through VI, XV and XVII pursuant to section 1385.[5] The court then sentenced defendant to 10 years four months as follows: the middle term of three years on count VIII; eight months (one-third the middle term) each on counts IX through XIV, XVI and XIX, consecutive to count VIII; and one year (one-third the middle term) each on counts XVIII and XX, also consecutive. The court split defendant's sentence with two years to be served in custody and the balance of eight years four months to be served under mandatory supervision.

On June 3, 2022, the trial court held a contested restitution hearing. The court ordered defendant to pay $16,584.86 in restitution to the sole victim, Patrick O.[6]

---

[2]     All further rules references are to the California Rules of Court.

[3]     The trial was bifurcated for the aggravating circumstances.

[4]     The trial court dismissed count XXI pursuant to the prosecution's motion during the trial.

[5]     The jury had already found defendant not guilty on count V prior to the trial court's dismissal of this count.

[6]     The record states the victim's first name is Patrick although he is also referred to as Rick.

3.

Defendant filed a timely notice of appeal from the judgment on March 30, 2022, and a timely notice of appeal from the postjudgment restitution order on August 1, 2022.

## FACTUAL SUMMARY

### I.     Prosecution's Case-in-Chief

#### A.     *Defendant's Power of Attorney for Patrick*

Defendant's uncle, Patrick, is a military veteran and was born in 1950.  Patrick is retired and considered 100 percent disabled by the Veterans Administration due to orthopedic conditions to both knees and his back.  He has diabetes and takes methadone for chronic pain.  Patrick has difficulty "with time."  He would not know what he had for breakfast three days ago but could say what he had 10 minutes ago.

Patrick's medical bills are fully covered by the Veterans Administration.  Patrick's sources of income include social security, veteran's benefits, and a retirement pension, which come to about $4,000 per month.  These benefits were deposited into Patrick's accounts with Bank of America.  Patrick had a checking account, savings account, and certificate of deposit account with Bank of America.

In early 2019, Patrick was living in a rented apartment in Sonora.  In January 2019, Patrick asked defendant to come over to look at his left leg which was swollen and had turned gangrene.  Defendant looked at Patrick's leg and called 911 to have an ambulance take Patrick to the emergency room at Sonora Regional Medical Center.  Patrick underwent surgery and was eventually transferred to the Veterans Administration Hospital in Palo Alto.  Patrick was hospitalized for about six months.

While Patrick was in the hospital, thieves broke into Patrick's apartment and stole several items.  Defendant invited Patrick to move in with him once Patrick was released from the hospital.  Defendant and Patrick agreed defendant would take care of Patrick's finances.  The two also informally agreed that a $1,000 per month payment to defendant

4.

would cover Patrick's room and board "and everything." Patrick was under the impression this agreement would start once he was living with defendant.

On February 20, 2019, Patrick executed and had notarized a durable power of attorney designating defendant as his agent and attorney-in-fact.[7] Defendant was also added as a power of attorney to Patrick's Bank of America accounts on March 14, 2019. Shannon Morfoot, a Bank of America financial center manager, testified that the power of attorney was brought into the banking center and reviewed by the legal department. The bank adds a signer change to the account to indicate a person has certain accessibility rights to banking transactions and to act on an individual's behalf. Morfoot confirmed Patrick's account still remained in Patrick's name only. Bank of America allows an account owner to have only one debit card.

Patrick was released from the hospital in June 2019 and was transported to defendant's house by the Veterans Administration. Defendant lived in a house owned by Mary Holmes with four bedrooms and about 12 acres of land on Jacksonville Road in Jamestown (hereinafter the "Jamestown house"). Defendant's nonprofit organization, Pilots of Wishes, was based at the house at that time. Patrick moved into the bedroom on the ground floor of defendant's house.

Defendant helped Patrick with his medications, cooked for him and took Patrick to his medical appointments. Patrick had a particular diet because he was diabetic. Patrick also had to wear diapers due to bowel issues and defendant helped Patrick clean up. Patrick asked defendant a couple times if he needed to pay defendant more than $1,000 per month but defendant told Patrick he was "paying more than enough."

---

**7**    The responsibilities identified in the power of attorney included:

"1.  THE LEGAL DUTY TO ACT SOLELY IN THE INTEREST OF THE PRINCIPAL AND TO AVOID CONFLICTS OF INTEREST.  [¶] 2. THE LEGAL DUTY TO KEEP THE PRINCIPAL'S PROPERTY SEPARATE AND DISTINCT FROM ANY OTHER PROPERTY OWNED OR CONTROLLED BY YOU.…"  (People's exhibit No. 1.)

Patrick denied authorizing his money be spent for the mortgage on the Jamestown house or to improve that property. Defendant and Patrick talked about building a garage at the Jamestown house so Patrick could build a three-wheeler motorcycle. Patrick was going to pay some of the cost of the garage and defendant was also going to pay some. Patrick said this was only talk, he never authorized Patrick to spend his money to build a garage. Patrick denied ever telling defendant he wished to fully support him including paying for defendant's lodging, food, and gas.

Around the time Patrick moved into the Jamestown house, Michael Choate moved into the upstairs of the house with his wife, Denise, and their daughter.[8] Defendant asked Choate to help him grow a cannabis garden at the house. Choate did not pay rent to defendant and understood that his family was living there in exchange for Choate's work. Defendant told Choate he wanted to purchase a piece of property referred to as the Yosemite Junction. Defendant wanted to have a restaurant on the property and hold weddings there. Defendant also told Choate about property he wanted to buy off of Highway 108. Defendant wanted to turn the property into a wedding venue and put tiny houses there. By approximately October or November 2019, Choate and Denise were providing most of Patrick's care at the house although defendant would still take Patrick to his medical appointments.

Bank of America mailed monthly statements for Patrick's accounts to the Jamestown house. Defendant asked Patrick if he wanted to see the statements but Patrick declined because he did not "want to be bothered with it" and could not read them due to his poor eyesight. Patrick felt defendant tried to protect him from spending his money on things defendant did not feel were necessary. Patrick would ask defendant to take him to the bank, but defendant would avoid the question or find a way not to take him.

---

[8] The Choates' other daughter also lived in the house for a couple months.

### B. *Disputed Checks and Bank Account Withdrawals*

Between August 19, 2019, and April 1, 2020, 11 checks were written in varying amounts from Patrick's Bank of America checking account to Pilots of Wishes, defendant's nonprofit organization:

1. Check No. 201 for $1,000 dated August 19, 2019 (count I).

2. Check No. 202 for $1,400 dated August 26, 2019 (count II).[9]

3. Check No. 203 for $1,400 dated August 30, 2019 (count III).

4. Check No. 204 for $1,400 dated September 9, 2019 (count IV).

5. Check No. 205 for $1,000 dated September 25, 2019 (count V).

6. Check No. 206 for $1,800 dated September 26, 2019 (count VI).

7. Check No. 207 for $800 dated September 27, 2019 (count VII).[10]

8. Check No. 208 for $4,000 dated February 14, 2020 (count XV).[11]

9. Check No. 226 for $2,900 dated March 4, 2020 (count XVII).[12]

10. Check No. 228 for $2,574 dated March 12, 2020 (count XVIII).

11. Check No. 229 for $2,600 dated April 1, 2020 (count XX).

Several of the checks stated "housing" in the memo section. Patrick denied writing or authorizing any of these checks.[13] Patrick did not like writing checks and always used

---

[9] Check No. 202 was dated August 23, 2019, but was not cashed until August 26, 2019.

[10] The first amended information states the check is dated September 26, 2019, but the evidence reflects a date of September 27, 2019.

[11] Check No. 208 was dated February 14, 2020, but was not cashed until February 27, 2020.

[12] The first amended information inadvertently referred to check No. 208 for this count although it was for check No. 226. The prosecutor clarified during trial the error was typographical and moved to correct the information, to which defense counsel made no objection. The trial court corrected the information via interlineation.

[13] As noted previously, the jury found defendant not guilty on counts I and V.

his debit card. Patrick testified he "never" authorized any money going to Pilots of Wishes.

Patrick also denied using his bank debit card or authorizing a charge of $4,010.86 at Hilmar Lumber on December 30, 2019 (count VIII). Patrick believed the Hilmar Lumber charge may have been for something for the Highway 108 property but denied authorizing the charge.

Between December 2019 and March 2020, there were also eight ATM cash withdrawals of $600 each from Patrick's Bank of America accounts for a total of $4,800. These withdrawals occurred on: December 30, 2019 (count IX), February 14, 2020 (count X), February 18, 2020 (count XI), February 21, 2020 (count XII), February 24, 2020 (count XIII), February 27, 2020 (count XIV), March 3, 2020 (count XVI) and March 18, 2020 (count XIX). Patrick denied making or authorizing these withdrawals. Patrick also denied making or authorizing several other transactions and withdrawals from his bank account while defendant's power of attorney was in effect. Patrick did not recall if he ever gave his debit card to defendant but said he may have. Patrick only had one debit card for his Bank of America accounts.

### C. Revocation of Defendant's Power of Attorney

Around March or April 2020, Patrick called Bank of America to check his account balances. Patrick was told by the bank there was less than $50 in his checking account and less than $50 in his savings account. Defendant had told Patrick that he tried to keep $10,000 in his accounts.

On April 1, 2020, Choate drove Patrick to Bank of America and Patrick revoked defendant's power of attorney on his bank accounts. On the same day, Patrick contacted Tuolumne County Adult Protective Services (APS). Melissa McCormick, a social worker from APS, met with Patrick in April 2020. McCormick went over Patrick's bank statements with him. She confirmed Patrick was consistent in his recollection of whether he made the transactions in his bank statements.

McCormick spoke with defendant by phone on April 6, 2020. Defendant told McCormick it was Patrick's wish for defendant to spend Patrick's money on all the expenses for defendant and his son, including food, gas, and lodging. Defendant said he was using Patrick's money to fix up a piece of property Patrick wanted to live on and pay mortgages on two properties. One of the mortgages was $2,600 per month for the Jamestown house. Defendant told McCormick he was also using Patrick's money to build a garage on another property. Defendant said he wrote checks to the Pilots of Wishes' business account and then paid the mortgages from that account. McCormick notified defendant during the call that Patrick had revoked his power of attorney.

Defendant left the Jamestown house on April 6, 2020. Patrick moved out of the house on June 1, 2020. Choate and his family continued to reside there until December 2021.

### D.    Police Investigation

APS provided a report, financial documents, and other documents including defendant's power of attorney for Patrick to the Tuolumne County Sheriff's Department to investigate potential elder theft by defendant. Tuolumne County Sheriff's Detective Eric Worthington was the investigating officer. Worthington met with Patrick to discuss the disputed transactions in his bank account and the agreement between defendant and Patrick to pay $1,000 per month for Patrick's care. He confirmed that Patrick's responses about the charged checks and ATM transactions were consistent with his trial testimony. Worthington tried unsuccessfully to speak with defendant as well.

## II.    Defense Evidence

Gary Punny Dambacher testified for the defense as an expert in estate planning and specifically in powers of attorney. Dambacher reviewed the power of attorney executed by defendant and Patrick. He testified the power of attorney permitted defendant to write checks and make withdrawals from Patrick's account. Dambacher explained that an attorney-in-fact is a fiduciary with certain obligations to the principal.

Dambacher testified that a fiduciary has "to deal with that property as if it is somebody else's property."

Jaime Rhinehart, a realtor, testified that she helped with the sale of the property off of Highway 108 to Cali Bottom.[14]  Patrick was excited to move to this property and told Rhinehart that defendant was going to make a garage there for Patrick.  Rhinehart described Patrick's previous apartment in Sonora as "filthy" with food everywhere, dirty dishes and drug paraphernalia.[15]  She saw defendant provide care for Patrick at the Jamestown house including cooking for Patrick, bandaging his foot, and administering his insulin.  Rhinehart never saw Choate or his family provide care for Patrick.

Sondra Ahlen, defendant's friend and a volunteer for defendant's nonprofit, Pilots of Wishes, also testified at trial.  Defendant introduced Ahlen to Patrick.  Patrick told Ahlen he was excited about having a garage at the Highway 108 property to build a motorcycle or trike there.

Defendant testified at trial that he started Pilots of Wishes in August 2018.  Pilots of Wishes provides services to veterans including housing.  Defendant confirmed Pilots of Wishes was based at the Jamestown house prior to April 2020.

Defendant said he provided a specialized diet for Patrick that improved Patrick's health.  He grew organic vegetables for Patrick.  Defendant primarily cooked for Patrick and purchased the groceries for the Jamestown house.  Defendant also provided wound care by changing the bandages on Patrick's foot.  Patrick wanted Choate's family to stay in the house to have a family dynamic.  Defendant denied that Choate became Patrick's primary caretaker in 2019.  Defendant reported that Choate cooked about once a month and occasionally assisted with medications for Patrick.

---

**14**      For clarity, Cali Bottom is a person.

**15**      The paraphernalia presumably belonged to Patrick's son who was a drug addict.

10.

Defendant made large purchases for Patrick. He purchased a freezer and a second refrigerator to accommodate Patrick's special diet. Defendant also bought two ramps for Patrick's mobility scooter. He purchased one of Patrick's mobility scooters for $1,800.

Defendant explained that checks Nos. 201, 202 and 203 paid to Pilots of Wishes from Patrick's checking account paid for rent at the house where Patrick was living. Mary Holmes had purchased this property and initially arranged with defendant to flip the house into a real estate investment. Defendant said there was an arrangement with the house's owner to pay $2,600 in rent, which was equivalent to the mortgage amount. Patrick liked having family around and was okay with paying the full rent on the house according to defendant. Defendant testified he talked with Patrick about purchasing the Jamestown house and Patrick was excited about the purchase. Defendant also talked to Patrick about seasonally using the Highway 108 property.

Defendant said the multiple $600 ATM withdrawals from Patrick's account paid for labor to build Patrick's garage and "other items" that benefited Patrick. Defendant paid cash to the laborers working on the Highway 108 property. Defendant communicated with Patrick about what he was doing with his money. Defendant said the approximately $4,000 charge at Hilmar Lumber paid for metal materials for the roof, siding and fencing for Patrick's garage. He told Patrick he spent $4,000 for those materials and Patrick was "very happy" about it.

Defendant learned his power of attorney had been removed from Patrick's bank account on April 3, 2020. Defendant asserted that all transactions in the criminal complaint were made for Patrick's benefit. He also said he had documentation at the Jamestown house showing how he used Patrick's money for Patrick's benefit. Defendant said a criminal stayaway order prevented him from going to the house to obtain those documents. When defendant was able to return to the house, he was unable to find the documents.

During cross-examination, defendant acknowledged he had a duty to act solely in Patrick's interest and avoid conflicts of interest under the power of attorney. Defendant was unable to explain multiple debit card purchases and cash withdrawals from Patrick's account, some of which were not charged in the information. Defendant testified the checks made out to Pilots of Wishes were written by him instead of Patrick because Patrick did not like checks.

## III. Prosecution Rebuttal Evidence

Choate was recalled to the stand for rebuttal. He confirmed defendant was no longer allowed at the residence after Patrick reported defendant to APS. Defendant's belongings were left as they were into the summer months of 2020. A time was scheduled for Choate to leave the property so defendant could come pick up his things in April or May 2020. Choate saw defendant and other people on the property with a pickup truck when they came to retrieve defendant's van.

The owner of the Jamestown house, Donna Holmes,[16] told Choate her attorney had sent defendant a demand to get his property from the house, but defendant did not respond. Holmes asked Choate to start removing stuff from the house because it was going to be put up for sale. Choate put defendant's belongings outside the house in a pile at Holmes' request.

## DISCUSSION

## I. Sufficiency of the Evidence

Defendant contends the evidence does not support a finding of identity theft because he was authorized to withdraw from Patrick's bank account as Patrick's attorney-in-fact and Patrick consented to the disputed transactions. Defendant also contends there

---

[16] Mary Holmes, the original owner of the house, died in January 2021. Donna Holmes is Mary's daughter-in-law.

12.

is insufficient evidence to support the elder theft convictions under either a theory of identity theft or embezzlement.

### A.    *Standard of Review*

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "[T]he trier of fact may rely on inferences to support a conviction where 'those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true.' " (*People v. Truong* (2017) 10 Cal.App.5th 551, 556.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio*, at p. 357; *People v. Johnson* (1980) 26 Cal.3d 557, 562; *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.)

### B.    *Identity Theft*

Section 530.5, subdivision (a) provides:  "Every person who willfully obtains personal identifying information, as defined in subdivision (b) of Section 530.55, of another person, and uses that information for any unlawful purpose, including to obtain,

13.

or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public offense, and upon conviction therefor, shall be punished by a fine, by imprisonment in a county jail not to exceed one year, or by both a fine and imprisonment, or by imprisonment pursuant to subdivision (h) of Section 1170."

"The elements of the crime [under section 530.5, subdivision (a)] may be summarized as follows:  (1) that the person willfully obtain personal identifying information belonging to someone else; (2) that the person use that information for any unlawful purpose; and (3) that the person who uses the personal identifying information do so without the consent of the person whose personal identifying information is being used."  (*People v. Barba* (2012) 211 Cal.App.4th 214, 223 (*Barba*).)[17]

Defendant was convicted on eight counts of identity theft for the eight ATM withdrawals of $600 each from Patrick's bank accounts between December 2019 and March 2020 (counts IX-XIV, XVI, XIX).  Defendant argues he had authority to withdraw money from Patrick's accounts pursuant to the power of attorney in place when these withdrawals occurred.

An attorney-in-fact is a fiduciary and owes fiduciary duties to his or her principal. (Prob. Code, §§ 39, 4266; *Pool-O'Connor v. Guadarrama* (2023) 90 Cal.App.5th 1014,

---

[17]    The jury was instructed on the elements of identity theft pursuant to CALCRIM No. 2040:

> "To prove that the defendant is guilty of this crime, the People must prove that:  [¶] 1. The defendant willfully obtained someone else's personal identifying information; [¶] 2. The defendant willfully used that information for an unlawful purpose; [¶] AND [¶] 3. The defendant used the information without the consent of the person whose identifying information he was using."

The instruction also defined "personal identifying information":  "Personal identifying information means checking account number, savings account number, PIN (personal identification number) or password or credit card number."

1025.) "An attorney-in-fact has a duty to act solely in the interest of the principal and to avoid conflicts of interest." (Prob. Code, § 4232, subd. (a).)[18] This duty was expressly stated in the power of attorney executed by defendant. Defendant acknowledged this duty in his testimony. The power of attorney did not grant defendant unfettered use of Patrick's money. Defendant was obligated to act solely in Patrick's interest in using funds from Patrick's bank accounts.

Defendant argues the prosecution provided no evidence he conducted the ATM transactions using Patrick's personal identifying information. Personal identifying information includes any name, savings account number, checking account number, PIN (personal identification number) or password or credit card number. (§ 530.55, subd. (b).) Defendant used Patrick's debit card to withdraw money from Patrick's bank accounts.[19] The power of attorney provided defendant with access to use Patrick's accounts for Patrick; defendant was not a co-owner of the bank accounts which remained solely in Patrick's name. Morfoot testified that Bank of America only allows an account owner to have one debit card and Patrick confirmed he only had one debit card. The jury could reasonably have inferred that defendant must have used Patrick's sole debit card and PIN to withdraw money at the ATMs. There is no requirement that defendant personated Patrick to withdraw money from his accounts to be convicted of identity theft. (*Barba*, *supra*, 211 Cal.App.4th at p. 226 [§ 530.5, subd. (a) does not require that a defendant have personated another to be convicted under its terms].) Those transactions thus constituted use of Patrick's personal identifying information.

---

[18] An attorney-in-fact is also required to keep the principal's property separate and distinct, and to keep records of all transactions entered into by the attorney-in-fact on the principal's behalf. (Prob. Code, §§ 4233, subd. (a), 4236, subd. (a).)

[19] Defendant does not dispute he made these withdrawals, only whether doing so constituted identity theft since he was authorized to withdraw from Patrick's accounts under the power of attorney. As will be further discussed herein, defendant contends he made these withdrawals with Patrick's consent.

15.

Defendant further contends the evidence is insufficient to prove the ATM withdrawals were for an unlawful purpose and without Patrick's consent. An "unlawful purpose" includes obtaining goods or services without the person's consent and is not limited to criminal activity. (*In re Rolando S.* (2011) 197 Cal.App.4th 936, 944–947 [unlawful purpose includes intentional civil torts]; *People v. Bollaert* (2016) 248 Cal.App.4th 699, 711–714 [same].) "What the statute contemplates and proscribes is using someone else's personal identifying information, without consent and for purposes that include obtaining credit or goods." (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 747.)

As discussed above, defendant was obligated to act solely in Patrick's interest when using Patrick's money as his attorney-in-fact. Defendant testified the ATM cash withdrawals paid for labor for Patrick's benefit. Specifically, the cash was reportedly paid to laborers to build a garage on the Highway 108 property. Patrick denied authorizing these withdrawals. Patrick also testified he never authorized use of his money to build a garage, and that he and defendant only talked about building a garage at the Jamestown house, not the Highway 108 property. Worthington testified that Patrick's responses during his investigation were consistent with his trial testimony.

There was thus conflicting testimony about whether the disputed withdrawals were done with Patrick's consent. Defendant primarily argues Patrick's testimony is not substantial evidence due to deficiencies with Patrick's ability to recall. Patrick acknowledged he has difficulty "with time" and testified he would not know what he had for breakfast three days ago but could say what he had 10 minutes ago. A witness's capacity to recollect is relevant to their credibility. (Evid. Code, § 780, subd. (c) [in determining witness credibility, the trier of fact may consider any matter that proves or disproves the truthfulness of the witness's testimony including the "extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies"].) The

16.

jury was accordingly instructed to consider how well a witness could remember and describe what happened in determining witness credibility. (CALCRIM No. 226.)

"Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) We do not reweigh the evidence or resolve conflicts in the evidence on review. (*Ibid*.) The jury presumably found Patrick more credible than defendant about whether Patrick consented to these withdrawals despite Patrick's self-professed memory issues. "We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) Patrick's testimony about whether he consented to these withdrawals was not inherently improbable such that we may disregard it and the "testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.)

Defendant highlights Patrick's testimony that he told defendant to get cash out of his bank accounts on certain occasions or for certain purchases as evidence that Patrick did authorize him to withdraw money from his accounts. That defendant also made valid withdrawals from Patrick's accounts at Patrick's direction does not evince Patrick's consent to *every* withdrawal defendant made.

Defendant also ignores deficiencies in his testimony that presumably affected his own credibility. Defendant "must *affirmatively demonstrate* that the evidence is insufficient" to show there is not substantial evidence to support the jury's findings. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) To do so, defendant must set forth "*all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade [the court] that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present [the court] with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was

insufficient because support for the jury's verdict may lie in the evidence he ignores." (*Id*. at p. 1574.) Defendant was unable to explain several transactions on Patrick's bank accounts while the power of attorney was in effect. The lack of explanation for those transactions permitted an inference that defendant did not always use Patrick's money for his benefit. (*People v. Massie* (2006) 142 Cal.App.4th 365, 373–374 [the trier of fact's province to decide whether to draw logical and reasonable deductions or conclusions from the proof of preliminary facts and determine the weight to be accorded those inferences].) Defendant claimed to have documentation that he only used Patrick's money for Patrick's benefit but testified he was unable to locate those documents or produce them as evidence. This claim was belied by testimony that defendant returned to the Jamestown house around April or May 2020 to retrieve some of his belongings and was later given further opportunity by the owner to collect from the house. The jury was free to disregard defendant's self-serving testimony as insufficient evidence that Patrick consented to the disputed withdrawals. (*People v. Barnes* (1986) 42 Cal.3d 284, 303–304 [the reviewing "court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact-finder"].)

There was substantial evidence that defendant's ATM withdrawals were made without Patrick's consent viewing the evidence in the light most favorable to the prosecution. A rational jury could therefore have found that defendant committed identity theft beyond a reasonable doubt.

### C. Elder Theft

The jury convicted defendant of elder theft for nine checks written to Pilots of Wishes (counts II-IV, VI, VII, XV, XVII, XVIII, XX) and the $4,010.86 debit card transaction at Hilmar Lumber (count VIII). The trial court dismissed counts II through VI, XV and XVII. Defendant stands convicted of the four remaining counts of elder theft for the following: $800 check No. 207 dated September 27, 2019 (count VII); $4,010.86 debit card transaction at Hilmar Lumber on December 30, 2019 (count VIII); $2,574

18.

check No. 228 dated March 12, 2020 (count XVIII); and $2,600 check No. 229 dated April 1, 2020 (count XX).

Section 368, subdivision (d) provides for criminal liability where a defendant "violates any provision of law proscribing theft, embezzlement, forgery, or fraud, or who violates Section 530.5 proscribing identity theft, with respect to the property or personal identifying information of an elder."[20] The statute "identifies the various theories under which a defendant may commit theft from an elder." (*People v. Baratang*, *supra*, 56 Cal.App.5th at p. 260.)[21]

The trial court instructed the jury on two theories of elder theft: identity theft and embezzlement. The jury was also properly instructed that it need not agree on which theory of theft applies provided they all agree defendant committed theft under at least one theory. (*People v. Vidana* (2016) 1 Cal.5th 632, 643, 649; *People v. Gonzales* (2017)

---

[20]    A violation of section 368, subdivision (d)(1) is a wobbler offense "when the moneys, labor, goods, services, or real or personal property taken or obtained is of a value exceeding nine hundred fifty dollars ($950)." (§ 368, subd. (d)(1); *People v. Baratang* (2020) 56 Cal.App.5th 252, 260.) If the value taken or obtained is $950 or less, the violation is a misdemeanor. (§ 368, subd. (d)(2).)

An " 'elder' means a person who is 65 years of age or older." (§ 368, subd. (g).) Defendant does not dispute that Patrick was an elder at the time of the offenses.

[21]    The jury instructions related to the felony charges identified the elements of elder theft pursuant to CALCRIM No. 1807:

> "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed theft, embezzlement, fraud, or identity theft; [¶] 2. The property taken or personal identifying information used was owned by or that of an elder; [¶] 3. The property, goods, or services obtained was worth more than $950; [¶] AND [¶] 4. The defendant knew or reasonably should have known that the owner of the property or person to whom the identifying information belonged was an elder."

Count VII was charged as a misdemeanor because that count was for an $800 check (i.e., less than $950). The jury instructions were identical for that count except the third element stated: "The property, goods, or services obtained was under $950."

2 Cal.5th 858, 866, fn. 9.) Defendant's convictions are not subject to reversal if there is substantial evidence supporting either theory of the theft. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127–1129.) "*Guiton* teaches that if a jury is presented with multiple theories supporting conviction on a single charge and on review one theory is found unsupported by sufficient evidence, reversal is not required if sufficient evidence supports the alternate theory and there is no affirmative basis for concluding the jury relied on the factually unsupported theory because it is presumed jurors would not rely on a factually deficient theory." (*People v. Llamas* (1997) 51 Cal.App.4th 1729, 1740.)

Defendant contends there is insufficient evidence to support the elements of theft from an elder by embezzlement.[22] Specifically, he contends the prosecution did not prove defendant had the specific intent to deprive his uncle of his property and fraudulently appropriate the property for his own use or purpose. Defendant does not challenge the sufficiency of the evidence of any of the elements other than specific intent.

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted." (§ 503; see § 506; *People v. Riley* (1963) 217 Cal.App.2d 11, 17.) "The elements of theft by embezzlement are the owner entrusted property to the defendant, the owner did so because he or she trusted the defendant, the defendant fraudulently converted the property for his or her own benefit and, in doing so, the defendant intended to deprive the owner of its use." (*People v. Beaver* (2010)

---

[22] Defendant also contends there is insufficient evidence he committed elder theft by identity theft, and thus these convictions cannot be sustained because there is no way to know which theory the jury relied upon. This inaccurately states the law pursuant to *Guiton*. Because we conclude there is sufficient evidence to support a finding that defendant committed theft from an elder by embezzlement, whether sufficient evidence supported the identity theft theory is not necessary to decide.

186 Cal.App.4th 107, 121; accord, *People v. Fenderson* (2010) 188 Cal.App.4th 625, 637.)[23]

"[T]he necessary mental state [for embezzlement] may be found to exist whenever a person, for any length of time, uses property entrusted to him or her in a way that significantly interferes with the owner's enjoyment or use of the property." (*People v. Casas* (2010) 184 Cal.App.4th 1242, 1247.) "An intent to deprive the rightful owner of possession even temporarily is sufficient and it is no defense that the perpetrator intended to restore the property nor that the property was never 'applied to the embezzler's personal use or benefit.' " (*In re Basinger* (1988) 45 Cal.3d 1348, 1363.) " '[A] bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1143; see § 511.) Whether defendant had a good faith belief is a question of fact for the trier of fact. (*People v. Proctor* (1959) 169 Cal.App.2d 269, 276.)[24]

Intent to steal is rarely susceptible of direct proof. (*People v. Moody* (1976) 59 Cal.App.3d 357, 363.) "Evidence of a defendant's state of mind is almost inevitably

---

[23]  The jury was instructed on these elements of embezzlement pursuant to CALCRIM No. 1806:

> "To prove theft by embezzlement, the People must prove that: [¶] 1. An owner entrusted his property to the defendant; [¶] 2. The owner did so because he trusted the defendant; [¶] 3. The defendant fraudulently converted that property for his own benefit; [¶] AND [¶] 4. When the defendant converted the property, he intended to deprive the owner of it."

[24]  The jury instruction on embezzlement included the following:

> "A good faith belief in acting with authorization to use the property is a defense. [¶] In deciding whether the defendant believed that he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith."

21.

circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) "Whether the evidence presented at trial is direct or circumstantial, … the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Towler* (1982) 31 Cal.3d 105, 118.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Bean* (1988) 46 Cal.3d 919, 932–933.)

There is substantial evidence from which the jury could reasonably have concluded defendant had the specific intent to deprive Patrick of his money at least temporarily, if not permanently, for defendant's own purposes. When Patrick checked his Bank of America account balances shortly before revoking the power of attorney, there was less than $50 each in both his checking and savings accounts despite his monthly income of approximately $4,000. The disputed checks were all made out by defendant to Pilots of Wishes from Patrick's checking account. Defendant never satisfactorily explained why he wrote checks to his nonprofit organization to pay for housing or other expenses for Patrick. As previously discussed, Patrick denied authorizing any of these checks or any of his money going to Pilots of Wishes. Patrick also said he did not authorize his money being spent to pay the mortgage or rent for the Jamestown house.

Defendant again relies on conflicting testimony to argue there is not substantial evidence Patrick did not consent to these transactions. Defendant testified that he communicated with Patrick about the $4,010.86 debit card charge at Hilmar Lumber. Patrick testified that he and defendant only talked about building a garage, but said he never authorized use of his money to build a garage. Patrick also specifically testified that he did not authorize the Hilmar Lumber transaction. As previously discussed,

22.

resolution of conflicts and inconsistencies in the testimony is the jury's exclusive province. (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.) The jury presumably found Patrick's testimony about whether he consented to pay for building the garage more credible than defendant's testimony. We may not second-guess the jury's credibility determinations on appeal.

Defendant contends his testimony is corroborated by the testimony of Rhinehart, Ahlen and Choate. Defendant overstates these witnesses' testimony. Rhinehart confirmed she spoke with Patrick about living on the Highway 108 property and building a garage there:

> "Q. Okay. Did [Patrick] say how he was going to have a garage at that property?
>
> "A.    He said [defendant] was going to make him a garage."

Rhinehart did not say Patrick agreed to *pay* for the proposed garage. Similarly, Ahlen testified that "[Patrick] and [defendant] were talking about building the motorcycle" at the Highway 108 property. Ahlen testified Patrick and defendant discussed building a garage, which is consistent with Patrick's own testimony. Neither Rhinehart nor Ahlen testified Patrick said he would pay for the garage or had authorized defendant to pay for building expenses from his own funds. Choate testified to seeing construction at the Highway 108 property, but he did not say Patrick was paying for the construction or had agreed to do so.

"If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 639.) A rational jury could reasonably find defendant had the specific intent to

23.

deprive Patrick of his property and we therefore reject defendant's challenge to the sufficiency of the evidence for his elder theft convictions.[25]

## II. *Brady* Error and Prosecutorial Misconduct

Defendant contends the prosecution committed a *Brady* error by failing to disclose the Pilots of Wishes' bank records to the defense. Defendant also contends the prosecutor engaged in misconduct by misleading the jury and failing to notify defendant of exculpatory information in the bank records. Alternatively, if there was no prosecutorial error or misconduct, defendant argues defense counsel rendered ineffective assistance of counsel for failure to review the prosecution's evidence.

### A. *Worthington's Testimony*

Worthington confirmed during defense counsel's cross-examination that he obtained and saw defendant's financial documents. Defense counsel then requested a side bar. Defense counsel advised the trial court he was unaware these records had been obtained and they had not been provided to him. When the prosecutor was asked if he has seen these documents, he responded: "I've looked at them very cursorily.I haven't looked at them in any detail. I'm not sure—at some point, it all depends on whether your

---

[25] Because we conclude there is substantial evidence to support the convictions by embezzlement, we need not address whether there is substantial evidence to support the alternative theory of elder theft by identity theft. (*People v. Guiton*, *supra*, 4 Cal.4th at pp. 1127–1129.) However, if we were required to resolve the issue, we would conclude that there is substantial evidence to support the elements of identity theft as well. Identity theft under section 530.5, subdivision (a) "does *not* require an intent to defraud." (*People v. Hagedorn*, *supra*, 127 Cal.App.4th at p. 741.) Patrick's bank accounts and debit charge card constitute personal identifying information under section 530.55, subdivision (b). (§ 530.55, subd. (b) [personal identifying information includes "checking account number, PIN (personal identification number) … or credit card number"]; see *Barba*, *supra*, 211 Cal.App.4th at p. 228 [checks include a person's checking account number which is personal identifying information].) Defendant used Patrick's personal identifying information to obtain goods or services. Because Patrick did not consent to these disputed checks or debit charge as previously discussed herein, defendant's theft from Patrick also satisfies the elements of identity theft.

client testifies, and then I'll look at them and see whether there's anything I want to do with them. It would be rebuttal on me. You have as much access to your client's records as I do. As a matter of fact, I think you have probably better access than I do." Defense counsel said that he felt "sandbagged." The court responded: "The point of it is, is that you have not been prejudiced because it's never been used. [The prosecutor] is correct that your client knows what is in his own financial records and has complete access to them, so I'm not sure what the problem is. He hasn't tried to elicit any testimony from Detective Worthington about those records." The sidebar then concluded.

The prosecution rested after Worthington's testimony was finished. Defense counsel requested to make a motion outside the jury's presence and the jury was excused. Prior to defendant's motion, the court discussed with the parties how defendant's financial records were obtained. Defense counsel was confused as to how the prosecution obtained defendant's financial records. The court did not see the relevance of how the prosecution obtained the evidence and stated, "the only basis for using them would be for impeachment purposes, and they don't have to disclose to [defendant] ahead of time what documents they're going to use for impeachment purposes." Defense counsel expressed concern that obtaining the records "touches on some privacy issues" but then moved on to make a section 1118.1 motion. The court denied defendant's section 1118.1 motion.

### B.    *Defense Posttrial Motions*

On February 1, 2022, before the verdicts were read, defense counsel moved to dismiss the case pursuant to *Brady* for the prosecutor's failure to disclose the Pilots of Wishes' bank records. Defense counsel argued the records were exculpatory because they showed defendant paid a credit card bill for Patrick in the amount of approximately $4,000. Defense counsel believed this was in relation to a $4,000 check charged in count XV and possibly one of the $600 ATM withdrawals. Defense counsel argued the prosecution improperly withheld exculpatory information and argued facts it knew were

25.

untrue in closing argument. The trial court declined to dismiss the case reasoning that the bank records were readily available to defendant, there was nothing suggesting the People hid or knew about something defendant could not or should not have known about, and the records did not exonerate defendant.

On February 23, 2022, following the jury's verdict, defendant filed a motion for a new trial. Defendant argued the prosecutor committed misconduct by failing to disclose Pilots of Wishes' bank records that were obtained by Worthington. Defendant believed these records showed he was entitled to the money he was convicted of stealing. The records showed two payments on Patrick's behalf totaling $5,555.25 as follows: $4,660.76 for a credit card in Patrick's name on October 25, 2019, and $894.49 for a car loan in Patrick's name on October 29, 2019.

The prosecution filed an opposition to defendant's motion for a new trial. A declaration from the prosecutor attached to the prosecution's opposition explained that Worthington asked the prosecutor if he could obtain a search warrant for the Pilots of Wishes' bank records about two months prior to trial. Worthington told the prosecutor the day before trial commenced that he had obtained the records but had not yet reviewed them. On the second day of trial, Worthington told the prosecutor he had reviewed the records but had not found anything useful in them. The prosecutor also reviewed the records and found nothing of value in them. The prosecutor did not note anything exculpatory in the records.

On February 23, 2022, defendant filed a request for the court to dismiss the case pursuant to section 1385. Defendant argued the Pilots of Wishes' bank records show he was entitled to the amount of money he took from Patrick. The prosecution filed a response asking the court to deny defendant's request.

On March 18 and 21, 2022, the trial court heard defendant's two motions. The court tentatively granted the motion to dismiss in part by dismissing counts II through VI, XV and XVII pursuant to section 1385. The court denied the motion for a new trial

26.

concluding that the bank records were not newly discovered evidence that could not have been discovered through diligent efforts by defendant.

### C. *Brady Error*

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) Evidence is material under *Brady* if there is a reasonable probability that its disclosure to the defense would have altered the trial result. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*); *People v. Verdugo* (2010) 50 Cal.4th 263, 279.) "The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor." (*Salazar*, at p. 1042.) "We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

There are three components to a *Brady* error: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the People, either willfully or inadvertently; and (3) prejudice must have ensued. (*Salazar*, *supra*, 35 Cal.4th at p. 1043.) "Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' " (*Ibid*.)

27.

The bank records are favorable to defendant because they show payments made for Patrick's benefit from the Pilots of Wishes' bank account. Specifically, the records showed a payment of $4,660.76 for Patrick's credit card on October 25, 2019, and a payment of $894.49 for Patrick's car loan on October 29, 2019.[26] The records specifically stated Patrick's name for these payments. This corroborates defendant's testimony that money from Pilots of Wishes was used to provide for Patrick. "Evidence probative of a testifying witness's credibility … is evidence favorable to the accused." (*People v. Morrison* (2004) 34 Cal.4th 698, 714 (*Morrison*).)

The prosecutor's duty to disclose evidence extends to records known to Worthington. (*Salazar*, *supra*, 35 Cal.4th at p. 1042; *People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709 [duty extends to evidence known to the police acting on the prosecutor's behalf].) The Pilots of Wishes' bank records were provided by Worthington to the prosecutor the day before trial commenced so they were also known to the prosecutor.

However, " '[e]vidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence.' " (*Morrison*, *supra*, 34 Cal.4th at p. 715.) As the founder and operator of Pilots of Wishes, defendant undoubtedly had access to the organization's bank records.[27] Part of his defense at trial

---

[26] Defendant alleges the undisclosed Pilots of Wishes' bank records also show he purchased a mobility scooter for Patrick and had reimbursed other funds to Patrick. This is factually inaccurate. The only transactions reflected in the Pilots of Wishes' bank records for Patrick's benefit are these two payments for his credit card and car loan. Nothing in these bank records show defendant purchased a mobility scooter for Patrick. The purported reimbursements to Patrick were based on Patrick's bank statements showing counter credits deposited into his bank accounts. Patrick's bank statements showing these counter credits were included in the People's exhibits so those records *were* disclosed to defendant. The Pilots of Wishes' bank records do not show deposits from its account into Patrick's bank accounts.

[27] For example, the Corporations Code provides directors of nonprofit corporations with an absolute right to inspect and copy records: "Every director shall have the

28.

was that Patrick's checks were paid to Pilots of Wishes because defendant paid Patrick's expenses from the Pilots of Wishes' account. If defendant wanted to produce documentation he provided for Patrick through the Pilots of Wishes' account, records showing the account's transactions could logically provide documentary evidence in his defense. The "prosecutor had no constitutional duty to conduct defendant's investigation for him." (*Morrison*, at p. 715.) We discern no valid reason why defendant could not obtain these records himself in the exercise of due diligence, nor does defendant provide a valid reason on appeal. " '[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.' " (*Ibid.*) There is no *Brady* error where the defense has sufficient information to obtain the evidence itself. (*People v. Superior Court* (*Johnson*), *supra*, 61 Cal.4th at pp. 716–719.)

Additionally, evidence presented at trial is not considered suppressed. (*Morrison*, *supra*, 34 Cal.4th at p. 715.) Although the Pilots of Wishes' bank records did not come into evidence, by the same reasoning, defense counsel learned the prosecution had obtained defendant's financial documents shortly before the prosecution rested and prior to presenting the defense so the evidence was not suppressed within the meaning of *Brady*. It is unclear why defense counsel could not have requested and presented the records as evidence to corroborate defendant's testimony that payments from the Pilots of Wishes' account were made for Patrick's benefit.

" '[S]trictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.' " (*Salazar*, *supra*, 35 Cal.4th at p. 1043.) The jury acquitted defendant on two of the elder theft counts. Both of those

---

absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the corporation of which such person is a director." (Corp. Code, § 6334.)

counts were for checks in the amount of $1,000, the agreed upon monthly amount between defendant and Patrick for Patrick's care. The jury rationally concluded defendant was entitled to that money pursuant to their agreement. The counts on which defendant was convicted consisted of checks and withdrawals in varying amounts totaling more than $1,000 per month. The Pilots of Wishes' bank records showed two payments specifically for Patrick on October 25, 2019, and October 29, 2019, totaling $5,555.25. Although these records would have corroborated defendant's testimony that he provided for Patrick through the Pilots of Wishes' bank account, defendant stands convicted of stealing substantially more than that amount from Patrick. These two payments do not squarely match dollar-for-dollar with any of the remaining counts, rendering the possibility the jury would acquit on other counts based on these records speculative. There was also evidence that defendant regularly used Patrick's money for uncharged transactions defendant could not explain. As the trial court found, these records do not exonerate defendant.

Defendant argues, as defense counsel argued below, that the Pilots of Wishes' bank records would have provided the jury with a different view of his intent related to the use of funds in Patrick's account. In his motion for a new trial, defense counsel argued this "newly discovered" evidence showed that only approximately $1,000 of Patrick's money was unaccounted for. This argument grossly overstated the import of the Pilots of Wishes' bank records and included alleged credits that were among the evidence presented to the jury. Defense counsel calculated the amount of the alleged theft was $29,684.46, but the total amount of "legitimate charges" was $28,655. The $28,655 figure included: $14,000 for $1,000 per month from February 2019 through March 2020, $5,100 in "deposits made into [Patrick's] account by defendant," $5,555.25 for the two payments in the Pilots of Wishes' bank records, and $4,000 for utility scooter and ramps. The jury was well aware of defendant and Patrick's informal agreement of $1,000 per month and the verdict reflects they considered that agreement in acquitting

30.

defendant on the two counts previously discussed.[28]  The approximate $5,100 in "deposits" were based on counter credits purportedly made by defendant, which were also presented to the jury through Patrick's bank statements and testimony.  No evidence was presented to the jury that these deposits were made by defendant and the Pilots of Wishes' bank records did not show he made these deposits.  The "evidence" defense counsel cited that defendant spent $4,000 on the utility scooter and ramps for Patrick was defendant's representation to defense counsel while in county jail.  Defendant testified that he purchased a scooter and two ramps for Patrick so the jury was also aware of those alleged purchases.

Ultimately, the only favorable evidence from the Pilots of Wishes' bank records that was not presented to the jury were the two payments totaling $5,555.25.  The possibility that the jury would have substantially altered their view of defendant's intent in using Patrick's money based solely on these two payments falls in the realm of speculation.  This is insufficient to undermine confidence in the outcome of the trial. (*Salazar*, *supra*, 35 Cal.4th at p. 1050.)

"Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies."  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Defendant's primary defense was that he did not misappropriate Patrick's money but used it to provide for Patrick pursuant to the power of attorney.  Nondisclosure of these bank records did not affect defendant's trial strategy because defendant consistently claimed he used Pilots of Wishes' account to provide for Patrick.

---

[28]     Defendant's calculation of $14,000 included months where Patrick arguably did not owe defendant per their agreement.  Specifically, defendant included February 2019 through May 2019 in the calculation although Patrick testified he understood the $1,000 per month agreement would start once he was released from the hospital in June 2019.

For these reasons, there is not a reasonable probability of a different result had the Pilots of Wishes' bank records been disclosed to defendant. Defendant has failed to establish the records were material under *Brady*.

### D.      *Prosecutorial Misconduct*

Defendant argues the prosecutor provided inaccurate and misleading information to the jury by arguing there was no proof defendant made any purchases or paid any money from the Pilots of Wishes' account for Patrick's benefit when the Pilots of Wishes' bank records showed otherwise. Defendant also argues the prosecutor engaged in misconduct by failing to disclose the bank records and misrepresenting those records to defense counsel.

### 1.      <u>Applicable Law</u>

The standards for evaluating prosecutorial misconduct are well established. (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)[29] "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.) " 'Although it is misconduct to misstate facts, the prosecutor "enjoys wide latitude in commenting on the evidence, including the

---

[29]      "[P]rosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.)

reasonable inferences and deductions that can be drawn therefrom." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 183.)

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*Hill*, *supra*, 17 Cal.4th at p. 820.)  A defendant will be excused from making an objection or requesting an admonition if either would be futile. (*Ibid.*)

### 2.      Prosecutor's Closing Argument

The prosecutor made the following argument in his closing:"[Defendant is] taking money and—for mortgages and putting it into the Pilots of Wishes account, and then it's going to pay Mary Holmes, which we have no proof that happened, and lots of transactions.And [Patrick] is not knowing about any of them.  [¶]  What's the explanation for hiding all that and laundering all that?Because he knows it's wrong.  Because he doesn't want [Patrick] to know.Because if [Patrick] knows, [Patrick] is going to scream bloody murder, so to speak.And he did.  [¶]  You have no proof of purchases.  You have no proof that he spent this money solely for the benefit of [Patrick]No accounting.No separation of expenses."  Defense counsel objected stating:  "It's a burden-shifting argument, your Honor.He's asking for my client to provide proof."  The trial court overruled defendant's objection.  The prosecutor proceeded:  "The only proof you have is hisword.  [¶]  I submit to you the defendant had pie-in-the-sky dreams, wanting to build a wedding chapel, wanting to build this, have duplexes, all kinds of things, fancy ideas.And he needed money to fulfill those dreams.And money must have been lacking at times.There were times where he didn't touch [Patrick's]account at all, and then there were times in three or four days $6,000 was gone."

Defendant's claim of prosecutorial misconduct is forfeited because he did not object at trial on the same grounds he raises on appeal.  (*Hill*, *supra*, 17 Cal.4th at p. 820.) Defense counsel objected to the prosecutor's argument as improper burden-shifting.  (*Id.*

at p. 829; *People v. Marshall* (1996) 13 Cal.4th 799, 831 [improper for a prosecutor to misstate the law and particularly to attempt to absolve the prosecution of its burden of establishing all elements of the crime beyond a reasonable doubt].)  Defendant did not object during the prosecutor's closing that his argument was misleading about the evidence.[30]

Even if the claim is not forfeited, defendant's contention is without merit.  The Pilots of Wishes' bank records were never introduced as evidence, and therefore these records were not among the evidence presented to the jury.  While the prosecutor may not misstate the record, the prosecutor may generally " 'comment on the record as it actually stands.' " (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1171.)  The prosecutor accurately stated the only proof before the jury is defendant's word that he provided for Patrick through the Pilots of Wishes' account.  The prosecutor asked the jury to make reasonable inferences based on the evidence before the jury about whether defendant was credible or improperly appropriated Patrick's money for his own purposes.  There was no misconduct in doing so.  (*People v. Powell*, *supra*, 6 Cal.5th at p. 183.)[31]

Defendant relies on cases where the prosecutor improperly made arguments about evidence that was erroneously excluded.  (See, e.g., *People v. Bittaker* (1989) 48 Cal.3d 1046, 1105 [improper for the prosecutor to lead the jury to believe an accomplice did not have a violent history when evidence of a prior violent rape by the accomplice was excluded].)  That is not what occurred here since the Pilots of Wishes' bank records were neither offered into evidence nor excluded.  We conclude that even if defendant's claim is preserved, the prosecutor did not commit misconduct in his closing argument.

---

[30]    Defense counsel did ultimately assert that the prosecutor improperly argued facts that were not true in his closing argument, but not until February 1, 2022, after the trial court was notified the jury had a verdict.  That was not a timely objection.

[31]    If the prosecutor *had* commented on these records, that would have been misconduct since they were not in evidence.  (*Hill*, *supra*, 17 Cal.4th at pp. 827–828 [misconduct for the prosecutor to refer to facts not in evidence].)

### 3. Prosecution's Representation to Defense Counsel

Defendant argues the prosecutor engaged in misconduct by failing to disclose the Pilots of Wishes' bank records and misrepresenting those records to defense counsel regardless of whether disclosure was required under *Brady*.

We have already determined the prosecution did not suppress the Pilots of Wishes' bank records because they were equally available to defendant. The "prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." (*United States v. Bagley* (1985) 473 U.S. 667, 675, fn. omitted.) The prosecutor is thus not obligated to disclose to defendant absolutely everything obtained during its investigation. The prosecutor did not intend to offer the records as evidence; he specifically said he only intended to offer them in rebuttal if defendant testified. The prosecution is not required to disclose impeachment evidence intended to be used for cross-examination of defense witnesses. (*People v. Tillis* (1998) 18 Cal.4th 284, 290–291.)

Defendant contends the prosecutor misled the defense about the Pilots of Wishes' bank records. The prosecutor explained during the sidebar about Worthington's testimony that he looked at the bank records "very cursorily" and had not "looked at them in any detail." At that point, the prosecutor could not comment on the records since he admittedly had not thoroughly reviewed them. The prosecutor's later briefs in opposition to defendant's posttrial motions state the prosecutor "indicated to the court and defense counsel he did not intend to introduce [the bank records] as his review did not find any utility to their introduction." In the prosecution's opposition to defendant's motion for a new trial, the prosecutor stated in his declaration that Worthington told the prosecutor on the second day of trial that he had "not found any evidence that would be useful" in the bank records. This was a statement from the detective to the prosecutor, not a statement

by the prosecutor to defense counsel.  Contrary to defendant's assertions, the record does not reveal the prosecutor misled defense counsel about these records.

Defendant focuses on defense counsel's statements to the trial court that the prosecution did not notify him that defendant's bank records had been subpoenaed.  The records were not obtained by subpoena—Worthington obtained the records from the Bank of Stockton pursuant to a search warrant.  The prosecution cannot be faulted for failing to disclose a nonexistent subpoena.

In short, we find the prosecutor did not misrepresent the evidence to the jury in closing argument or mislead defense counsel.  There was thus no prosecutorial misconduct.

### E.    *Ineffective Assistance of Counsel*

If there was no prosecutorial error or misconduct, defendant argues in the alternative that defense counsel rendered ineffective assistance of counsel for failure to request or review the Pilots of Wishes' bank records.

To prevail on an ineffective assistance of counsel claim, defendant must prove: (1) trial counsel's performance was deficient and (2) counsel's deficient performance prejudiced defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  To show prejudice, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Id.* at p. 694.)  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  (*Id.* at p. 695.)

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. …  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed."  (*Strickland v. Washington*, *supra*,

466 U.S. at p. 697.) We need not determine if defense counsel's performance was deficient because we have already concluded there is not a reasonable probability of a different outcome if the Pilots of Wishes' bank records had come into evidence. As previously discussed, these records showed payments for Patrick's credit card and car loan totaling $5,555.25, but defendant was convicted of stealing substantially more than that from Patrick. The evidence did not indicate a correlation between the amounts of these two payments and the amounts defendant was convicted of taking from Patrick's accounts. Even if defense counsel had requested or reviewed the Pilots of Wishes' bank records, there is no reasonable probability of a different outcome. We therefore reject defendant's claim of ineffective assistance of counsel.

## III.    Restitution Order

Defendant contends the restitution awarded to Patrick amounts to a windfall because the amount includes money already reimbursed to Patrick. The People respond that the restitution order should be reduced to $14,784.86 to correct a calculation error but otherwise affirmed. We agree with the People.

### A.    *Restitution Hearing and Order*

On June 3, 2022, the trial court held a contested restitution hearing. The prosecutor calculated $28,684.86 as Patrick's total loss on the charges for which defendant was convicted and $16,584.86 as the amount remaining after the court dismissed certain counts. The prosecutor argued the trial testimony constituted a prima facie showing of the victim's loss. Restitution in the amount of $28,684.86 to Patrick was requested.

Defense counsel argued for setoffs of $5,100 defendant purportedly deposited into Patrick's bank account as counter credits and $5,555.25 for the two payments for Patrick reflected in the Pilots of Wishes' bank records. The counter credits are shown in Patrick's bank statements from August 2019 through November 2019 and in April 2020.

37.

Defense counsel also provided the court with a receipt for a mobility scooter purchased for $1,800.

The trial court ordered restitution of $16,584.86, the amount the prosecution calculated defendant was convicted of stealing. The court acknowledged Patrick received a windfall of over $5,000 for payments made to Patrick's bills by Pilots of Wishes but rejected defense counsel's argument that defendant should receive a credit for those payments. The court reasoned that those payments came from the nonprofit organization, not from defendant himself, and thus defendant was not entitled to a credit for those payments.

### B. Applicable Law and Analysis

A crime victim is entitled to "restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) Specifically, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f); Cal. Const., art. I, § 28, subd. (a).) The amount of restitution "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (§ 1202.4, subd. (f)(3).)

"[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole." (*People v. Baker* (2005) 126 Cal.App.4th 463, 470 (*Baker*).) We review the trial court's restitution order for abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 663.) "No abuse of that discretion occurs as long as the determination of economic loss is reasonable, producing a nonarbitrary result." (*Id.* at p. 665.) "When there is a factual and rational basis for the amount of restitution ordered, no abuse of discretion will be found." (*People v. Phu* (2009) 179 Cal.App.4th 280, 284.)

38.

"[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt." (*Baker*, *supra*, 126 Cal.App.4th at p. 469.) "After the People have 'made a prima facie showing of [the victim's] loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.' " (*People v. Millard* (2009) 175 Cal.App.4th 7, 30.) "[D]irect victims of crime have a statutory right to restitution on the full amount of their losses without regard to the full or partial recoupment from other sources (except the state Restitution Fund)." (*Baker*, at p. 468.) "Victims are entitled to an amount of restitution so as to make them whole but not more than their actual losses arising out of the defendant's criminal conduct." (*People v. Nichols* (2017) 8 Cal.App.5th 330, 342.) "[A] restitution order 'is not … intended to provide the victim with a windfall.' " (*People v. Millard*, at p. 28.)

The jury convicted defendant on all but counts I and V. The trial court dismissed counts II through VI, XV and XVII. At the restitution hearing, the court properly signaled its intent to limit restitution to the remaining counts on which defendant was convicted. (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1249.) The court ordered restitution in the amount of $16,584.86 per the prosecution's calculation. However, as the People concede in their opposition, this calculation was inaccurate. Patrick's loss for the remaining convictions totals $14,784.86 for: the eight ATM cash withdrawals of $600 each for a total of $4,800 (counts IX-XIV, XVI, XIX); $800 check No. 207 (count VII); $4,010.86 debit card transaction at Hilmar Lumber (count VIII); $2,574 check No. 228 (count XVIII); and $2,600 check No. 229 (count XX). Therefore, the restitution order must be modified to accurately reflect Patrick's losses resulting from defendant's criminal conduct.

Defendant contends the trial court abused its discretion by failing to account for amounts Patrick was already reimbursed. Defendant argues there was "direct evidence" of reimbursements totaling $10,653.83 to Patrick for the counter credits and payments to

39.

Patrick's credit card and car loan. This total is based on the $4,660.76 payment on Patrick's credit card by Pilots of Wishes, the $894.49 payment on Patrick's car loan by Pilots of Wishes and $5,098.58 in counter credits.

Defendant analogizes the Pilots of Wishes' payments on Patrick's credit card and car loan to losses paid to a victim by a defendant's insurance company. A defendant is entitled to an offset in the amount of restitution owed for payments to cover the victim's losses made by defendant's insurer. (*People v. Bernal* (2002) 101 Cal.App.4th 155, 167–168 [victim's restitution must be offset by any monies paid by defendant's insurance carrier for losses subject to the restitution order]; accord, *People v. Jennings* (2005) 128 Cal.App.4th 42, 56–57; but see *People v. Birkett* (1999) 21 Cal.4th 226, 246 [victim is entitled to full restitution except as against the Restitution Fund regardless of whether victim recovered their losses from their own insurance carrier]; *People v. Vasquez* (2010) 190 Cal.App.4th 1126, 1133–1134 [defendant is not entitled to an offset for payments from the *victim's* insurer or an independent third party].) The Court of Appeal reasoned that "the relationship between the defendant and its insurer is that payments by the insurer to the victim are 'directly from the defendant.' " (*People v. Bernal*, at p. 168.)

We cannot agree that payments from Pilots of Wishes for Patrick's bills are "directly from the defendant" such that he is entitled to an offset. Pilots of Wishes is not defendant's insurance carrier; it is a nonprofit organization that provides services to veterans. Patrick is entitled to restitution for his losses resulting from defendant's convictions "without regard to the full or partial recoupment from other sources." (*Baker*, *supra*, 126 Cal.App.4th at p. 468.) Despite defendant's dubious accounting method of paying checks from Patrick's bank account to Pilots of Wishes, this practice did not convert the organization into defendant's personal slush fund, nor did it indemnify defendant against Patrick's economic losses. As the trial court concluded, defendant and Pilots of Wishes are not one and the same for purposes of restitution: "Because he runs Pilots of Wishes doesn't mean he is Pilots of Wishes." Pilots of

40.

Wishes' payments were not "directly from the defendant" and defendant is not entitled to an offset for recoupment of Patrick's losses from a third party.[32]

Patrick's bank statements showed counter credits made into Patrick's bank account from August 2019 through November 2019 and in April 2020. Morfoot, a Bank of America financial center manager, testified that a counter credit occurs when a person deposits money inside a banking center. The statements show the date and amount of the credits but do not state who made the credits into Patrick's account. The only evidence showing defendant was the one who made these deposits was his own testimony. Defendant has the burden of proof to show entitlement to an offset. (*People v. Vasquez*, *supra*, 190 Cal.App.4th at p. 1137.) The trial court was free to disregard defendant's testimony as insufficient evidence he deposited these counter credits and there was no abuse of discretion in doing so.

Lastly, defendant argues the trial court failed to account for the $1,800 mobility scooter purportedly purchased for Patrick in determining restitution. Defense counsel provided the court with an $1,800 receipt for a mobility scooter. The court noted the receipt did not reference Patrick. Defendant called a witness, Heather Schoon, to provide testimony the scooter was purchased for Patrick. Schoon was unable to verify the scooter was purchased by Pilots of Wishes specifically for Patrick. The court concluded the receipt only showed the purchase of a mobility scooter, but did not show it was purchased for Patrick. Again, defendant holds the burden of proof to show entitlement to an offset. There was no factual basis to provide an offset for the scooter and the court properly did not provide one.

---

[32]     Because defendant deposited Patrick's money, not his own money, into the Pilots of Wishes' account, the situation here is more analogous to recoupment from the victim's insurance carrier. Defendant would not be entitled to an offset for payments by the victim's insurer to cover the victim's losses. (*People v. Birkett*, *supra*, 21 Cal.4th at p. 246.)

Therefore, the trial court did not abuse its discretion in ordering restitution in the amount for which defendant was convicted without any offset.  The restitution order must be corrected due to the calculation error but is otherwise affirmed.

## **DISPOSITION**

The restitution order is modified to reduce the amount payable to Patrick to $14,784.86.  The trial court is directed to issue an amended minute order and abstract of judgment reflecting the modification.  As so modified, the judgment is affirmed.


DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.